## Blaydes et al. v. Blaydes et al.

(Decided Jan. 22, 1935.)

M. O. SCOTT, L. R. NUNN and GORDON MONTGOMERY for appellants.

A. J. THOMPSON and J. H. GRAHAM for appellees.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Affirming.

On October 12, 1906, A. R. Keltner and G. H. Blaydes entered into a contract whereby the former, in consideration of $2,000 to be paid, evidenced by a note of that date due on or before December 1, 1906, and bearing interest from date, agreed to convey to the latter upon payment of the note a tract of land in Metcalfe county containing 300 acres. On November 29, 1906, A. R. Keltner and wife conveyed the land mentioned in the contract to G. H. Blaydes, Buell Blaydes, and J. P. Blaydes for $2,000 in hand paid. In 1914, Buell Blaydes and his wife conveyed his entire undivided interest in the land to G. H. Blaydes.

J. P. Blaydes died intestate on May 9, 1913, survived by a widow, Allie Blaydes, whom he married in 1909, and by a son, Davis Blaydes, who at the time of his father's death was something over two years old. No administrator or personal representative of deceased was ever appointed. After Davis Blaydes attained his majority, he and his mother and Arthur Edwards, with whom his mother had intermarried, instituted this action against G. H. Blaydes, Buell Blaydes,

and other defendants to whom G. H. Blaydes or Buell Blaydes or their vendees conveyed various portions of the land, and in their petition as amended alleged in effect that Davis Blaydes had acquired by inheritance his father's title in fee to a one-third undivided interest in the entire tract of land, subject to the dower interest of his mother, and that they were the joint owners therein with the defendants named in the petition; that neither the tract as a whole nor the parts thereof which they jointly owned with the various defendants could be divided without materially impairing their value and the value of the interest of each of the joint owners therein. They asked for a sale of the land and for a division of the proceeds to the various parties as their interests might appear.

Defendants, after a general denial of the material allegations of the petition as amended, in a second paragraph of their answer and counterclaim alleged, in substance, that prior to the execution of the deed G. H. Blaydes had paid $100 on the note mentioned in the contract or title bond from A. R. Keltner, and in order to pay the balance of the purchase price when the deed was made he and his brothers, Buell and J. P. Blaydes, executed a note to the Farmers' and Merchants' Bank of Edmonton for $1,900; and in order to secure the payment of the note, executed and delivered to the bank a mortgage on the tract of land described in the deed and also on another tract of 60 acres which was jointly owned by Buell and J. P. Blaydes; that at the time, it was understood and agreed between the brothers that the name of J. P. Blaydes would be placed in the deed to secure him in mortgaging his land to assist his brothers in getting the money; that if he afterward decided to be a joint owner in the land conveyed by the deed he could do so by paying his part of the consideration which he never elected to do but refused, electing not to be a joint owner; that after G. H. and Buell Blaydes had paid $700 on the note to the bank and J. P. Blaydes had paid nothing thereon and was exercising no right of ownership to the land, the latter during his last illness and in the presence of his wife and brothers agreed that if G. H. and Buell Blaydes would have the mortgage on the 60 acres released, J. P. Blaydes would have no interest in the 300-acre tract conveyed by the Keltners; that they complied with their promise and had the mortgage released by the bank in so far as the

land of J. P. Blaydes was concerned; that by reason of these facts and circumstances, the deed, although absolute on its face, was in reality only a mortgage to J. P. Blaydes, and that same had been duly released; that J. P. Blaydes never paid any part of the consideration of $2,000 for the land, and never at any time exercised ownership or control over it.

In a third paragraph it is alleged that G. H. Blaydes paid the entire consideration for the 300 acres, and that neither J. P. Blaydes nor plaintiff had ever reimbursed him for any part of the sum so paid. Defendants asked that the deed in so far as J. P. Blaydes was concerned be adjudged a mortgage, but that if the court should be of the opinion it was not a mortgage, that G. H. Blaydes be adjudged an equitable lien on whatever part of the land the court might adjudge the plaintiffs owned to secure the consideration he had paid therefor and for an enforcement of the lien.

By reply plaintiffs traversed the affirmative allegations of the answer and counterclaim and pleaded limitation and laches as to the counterclaim set up in the second and third paragraphs thereof.

After proof had been taken by deposition, defendants filed an answer to conform to the proof and alleged that at the time referred to in the original answer when J. P. Blaydes mortgaged his land, together with Buell and J. P. Blaydes, he was indebted to G. H. Blaydes and could not pay him and instead of paying what he owed joined in the mortgage to assist them or G. H. Blaydes to secure the $1,900 note at the bank; that the relationship of creditor and debtor existed between G. H. Blaydes and J. P. Blaydes at the time the mortgage was executed, and that J. P. Blaydes never paid to G. H. Blaydes any of the money he owed him; that G. H. Blaydes caused the mortgage to the bank to be released as set out in their answer, accepted it as payment of the debt which J. P. Blaydes owed him, and canceled the debt and mortgage as referred to in his answer.

Plaintiffs filed exceptions to the deposition of G. H. Blaydes and other witnesses introduced by defendants. The court sustained the exception to the deposition of G. H. Blayes in so far as it related to the conversation alleged to have been had with his brother J. P. Blaydes.

and concerning all transactions had with him involving the land in controversy. The exceptions in all other respects were overruled.

On final hearing it was adjudged that the second and third paragraphs of defendants' answer and counterclaim be dismissed and plaintiffs be granted the relief sought, and defendants are appealing.

The proof for plaintiffs fully sustains their allegations that the land in controversy cannot be divided among the parties in interest without impairing its value, and defendants offered no proof on this phase of the case. It appears in evidence that J. P. Blaydes by himself or in connection with his brother Buell Blaydes cultivated portions of the land in controversy practically every year from the time it was conveyed to them until his death. At the time of his death he had crops growing on the land. G. H. Blaydes' evidence tends to sustain defendants' pleading with respect to his conversation and understanding with his brother J. P. Blaydes, and as to his payment of all the purchase price of the land. The court, as already indicated, sustained exceptions to the greater portion of his evidence, and properly so, as we view the matter, under section 606 of the Civil Code of Practice. He was permitted to testify as to payments made on the note which were evidenced by canceled checks given by him aggregating about $930. The other payments on the note are evidenced by credits thereon, but there is nothing to show by whom they were made, except a credit of $250 paid by Buell Blaydes in 1907. There is some evidence as to statements made by J. P. Blaydes which might indicate that he was claiming no interest in the land in controversy; however, there is evidence for plaintiffs contradicting some of this evidence and indicating that he made no such statements. There is room for argument that the court should have sustained exceptions to the evidence of some of the witnesses other than G. H. Blaydes concerning statements made by J. P. Blaydes, but the conclusion we have reached respecting the sufficiency of the evidence to sustain the chancellor's finding renders this a matter of no concern.

The deed, regular on its face, conveyed the land jointly to the three brothers, and a decided weight of evidence shows that J. P. Blaydes claimed an interest in the land and exercised acts of ownership over it until

his death. There is evidence to indicate that the proceeds of the crops raised during his life were paid on the land. If in fact he owned no interest in the land, the title of G. H. Blaydes was defective, and he was fully acquainted with all the facts, yet took no steps either before or after the death of J. P. Blaydes to perfect his title, but according to his evidence paid the full purchase price under a title showing on its face that J. P. Blaydes was a joint owner. The evidence shows that shortly before the death of J. P. Blaydes there was a balance of about $1,300 due on the land, and apparently G. H. Blaydes has paid this balance. On the other hand, he has had the use of the land since his brother died in 1913, and has not accounted to plaintiffs for any of the proceeds therefrom. Taking into consideration all the proven facts and circumstances, it is manifest that the decisive weight of the evidence favors the finding of the chancellor.

In equitable actions the appellate court is not bound by the chancellor's findings of fact, but will weigh and consider the evidence for itself and will set aside such finding if found to be contrary to the evidence (Blanton v. Osborne, 239 Ky. 389, 39 S. W. [2d] 698; Reiss v. Wintersmith, 241 Ky. 470, 44 S. W. [2d] 609); but a judgment in such actions in accord with the weight of evidence or where the mind is left in doubt as to its correctness should not be disturbed (Green v. Davis, 253 Ky. 105, 68 S. W. [2d] 750; Flanagan's Adm'x v. May, 234 Ky. 653, 28 S. W. [2d] 971).

Judgment affirmed.